# WL| Wright Law
## ATTORNEY AT LAW

299 B\ROADWAY, S\UITE 708
N\EW Y\ORK, NY 10007
O\FFICE (212) 822-1419 • F\ACSIMILE (212) 822-1463
wrightlawnyc@gmail.com
www.wrightlaw.nyc

May 7, 2024

**VIA ECF**
The Honorable Judge Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Foley Square
New York, New York 10007

Re: *United States* v. *Isaiah Thomas 22-CR-00343(JMF)*

Dear Judge Furman:

### I.   **Preliminary Statement**

The undersigned respectfully submits this letter in advance of Isaiah Thomas' ("Isaiah" or "Mr. Thomas") sentencing proceeding, which is scheduled for May 16, 2024, following his January 11, 2024 guilty plea, to Count 8 for Attempted Murder and Assault with a Dangerous Weapon in Aid of Racketeering (18 U.S.C. §1959(a)(3), (a)(5)); and to the lesser-included offenses in Counts 9 and 13 for Use of a Firearm in Furtherance of Crimes of Violence (18 U.S.C. §924(c)(1)(A)(i)).

As detailed below Mr. Thomas is a 25 year old young man who was born into a fractured family and raised in a profoundly emotionally troubled household; he has spent much of his life struggling to overcome intractable challenges. The instant offense conduct and Isaiah's prior failings are assuredly the product, in part, of his crippling mental illness, immaturity and a chaotic childhood.

> My parents weren't there for my childhood and the only comfort came from hanging out with my friends. I spent so much of my youth alone and no one to guide me or help me. I regret it all. I want to move on from my mistakes and live a life.[1]

---
[1] Isaiah Thomas letter, Ex. A.

1

Unfortunately for Mr. Thomas, his adulthood has been marked by catastrophic mistakes which included blind loyalty to his friends and his terrible decision to engage in the offense conduct. Mr. Thomas makes no excuses for his offense conduct and wakes up every morning in his desolate jail cell with the crushing awareness of the gravity and consequence of his criminal conduct; conduct for which he earnestly accepted responsibility, pled guilty and now stands ready to be sentenced.

We respectfully request a sentence significantly below the Guidelines range that would appropriately account for Mr. Thomas' youth, extraordinarily difficult childhood, mental illness, conditions of confinement and his relative culpability in comparison to other co-defendants.

## II.  History and Characteristics

### Isaiah Thomas' Upbringing - "Abandonment and Neglect"

Mr. Thomas was born in 1998 in Fort Lauderdale, FL to a father, Renold Thomas, who is a retired U.S. Navy career service member and a mother, Kim Antonio, who is unemployed. PSR ¶153. His parents had a fraught relationship that was marked by domestic violence and police involvement. PSR ¶¶155-156. His parents never married each other and Isaiah spent much of his childhood shuttling between his parents' respective homes; adding to this chaos was his father's constant relocating due to his military obligations. PSR ¶¶153-166.

Unfortunately for Isaiah his mother struggled with drug addiction and mental illness; which at times expressed itself in violence towards other family members. PSR ¶¶155-156. When Isaiah was around age 9 his mother had a mental health breakdown while they were living in Norfolk, VA that led to police involvement and the eventual end of his parents' contentious relationship. PSR ¶156. Isaiah's father let his mother take him and his siblings and they lived destitute out of a van for a period of time in Florida; which needless to say was a deeply troubling time for 9 year old Isaiah. Id.

Throughout his formative years Isaiah continued to find himself moving around frequently and living with different family members throughout Florida and Virginia; where he would go significant periods of time with no contact from either parent. PSR ¶¶ 157-158. Isaiah was never able to settle at one school and form friendships like most other children his age. At age 16 his mom settled in the Bronx, NY and his father moved to suburban Chicago, IL. PSR ¶159-160. Isaiah's father provided greater stability but at times the relationship proved contentious and he found himself staying with his mother in Bronx. PSR ¶159.

Isaiah's mother lived in wretched conditions in the Bronx with his younger sister, but he was drawn to the excitement of New York City and it was at this time (age 16) that he first started hanging out with gang members in the Bronx. Id. Indeed, Isaiah's nickname was "Chicago" because he was not actually from the Bronx like the other gang members; he was in many ways an outsider to the gang. PSR ¶2. Tragically, as many alienated and lonely teenage boys do, Isaiah found solace, comfort and a family in gang membership. Isaiah was despondent at this point in his life and felt there was no adult to turn to for help "my own parents had abandoned me and I felt no hope for any sort of normal life."

2

Isaiah went back and forth between his father in Chicago and his mother in the Bronx, but eventually his father told him when he was 18 years that "I had to leave and my father turned his back on me forever" after Isaiah made one of his many suicide attempts by going to the roof his father's house armed with a sword threatening to kill himself. PSR ¶162-163. Isaiah found himself back in the Bronx with his mother, he was unemployed and a high school dropout and turned to a life of crime of shoplifting and selling marijuana. Id. His mother was overwhelmed by her own mental health struggles and drug addiction to provide any guidance to a confused and frightened teenage Isaiah.

### *Isaiah Thomas' Adulthood – "Disconnected and Isolated"*

Tragically for Isaiah, his adulthood has been marked by the same isolation and remoteness that scarred his adolescence as he has never been able to develop a close relationship with either his mother or his father. In his late teenage years Isaiah, unfortunately, discovered that stealing Apple products and then selling them on the underground market could be very lucrative, and it became his *mode de vie*. PSR ¶163. The PSR details Isaiah's extensive and profligate criminal history of shoplifting Apple products throughout numerous jurisdictions. PSR ¶¶122-151.

From the tender age of 19 through age 22, Isaiah racked up many arrests for various shoplifting charges and spent much of those years in and out jails across a number of states. Id. Indeed, when Isaiah was arrested in regard to the instant indictment he was just completing a 12 month sentence in Maine for stealing Apple products from a Target store. PSR ¶132. Mercifully, none of Isaiah's prior arrests involve the use of any firearms or acts of violence, as they all seem related to department store thefts. PSR ¶¶122-151.

In an otherwise very difficult adjustment to adult life, the one bright spot for Isaiah was the birth of his daughter, RT, who is now 3 years old. PSR ¶164. RT's mother, Tionnay Boozer, is a former girlfriend with whom he maintains a good relationship despite his current incarceration. Id.

### *Isaiah Thomas' Mental Illness, Suicide Attempts and Substance Abuse*

As discussed above, Isaiah suffered through a difficult childhood marked by parental neglect, poverty and pervasive instability. Isaiah's first suicide attempt was at age 13 when he cut his wrists while living with his father in Virginia. PSR ¶178. Suicidal ideation continued unabated through his teenage years and he often contemplated his own death by hanging or swallowing pills. Id. Isaiah was hospitalized multiple times in regard to massive depressive episodes that often involved self-harm in Illinois, Florida and here in New York City. PSR ¶179. Records from the BOP-Metropolitan Detention Center ("MDC") confirm a suicide attempt on May 31, 2023 where Isaiah was found by MDC jail staff with a noose around his neck. PSR ¶180. Isaiah was subsequently placed on suicide watch and proscribed suboxone and Remeron to treat his crippling depression. PSR ¶181.

Unquestionably the abuse and abandonment Isaiah suffered as a child has caused incalculable harm upon Isaiah's emotional development. Isaiah's parents were either indifferent

3

or disregarded the obvious and crushing despair that gripped their son. That troubling childhood haunts Isaiah to this day, and he eagerly wants to avail himself of mental health treatment once he is sentenced and transferred out of the MDC jail.

As is the case with all too many people, Isaiah has sought to self-medicate his shame and sadness by abusing narcotics and alcohol. Isaiah started smoking marijuana at around age 12 and continually abused marijuana up until the instant arrest. PSR ¶183. He also become an habitual smoker of synthetic marijuana when he was around 22 years old and continued to use that drug even while in various prisons including the MDC jail as recently as February 2024. PSR ¶184. Throughout his young life, Isaiah has also at times abused Lean (codeine and soda), opiate pain killers and alcohol. PSR ¶¶186-189.

Isaiah is committed to entering substance abuse treatment once he is transferred out of MDC jail and is acutely aware that he will have to lead a sober life once he is ultimately released from prison. Notably, Isaiah's involvement with the instant criminal conduct coincided with his heaviest abuse of narcotics.

### III.     Legal Standard: 18 U.S.C. § 3553(a) Factors

As this Court is undoubtedly aware, the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), has reshaped the way a sentencing judge can impose a sentence. The sentencing court may consider the U.S.S.G guideline range, as well as any basis to depart from that range. However, the court is no longer required to impose a sentence within that range. In fact, the federal sentencing guidelines are but one factor among several in determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

The guidelines are only the "starting point and initial benchmark…" *Id., citing Gall v. United States*, 552 U.S. 38, 50 (2007). "Sentencing courts are not to 'presume that the Guidelines range is reasonable,' and instead they 'must make an individualized assessment based on the facts presented.'" *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (internal citations omitted). It is the sentencing judge who has the advantage of familiarity with the details of the case and can best evaluate the import of the § 3553(a) factors. *Id., Kimbrough*, 552 U.S. at 109, *citing Gall*, 552 U.S. at 51.

In determining a sentence for Mr. Thomas that is "sufficient, but not greater than necessary," the first of those factors the judge must consider is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Without a doubt, the breadth of this factor alone extends far beyond the guidelines and implores the sentencing judge to consider the unique circumstances and characteristics of Mr. Thomas. A consideration of those characteristics, along with the remaining six factors,[2] may render

---

[2] The seven factors are (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to reflect the goals of sentencing set forth in § 3553(a)(2); (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims. See 18 U.S.C. § 3553(a).

sentences that do not fit within the guidelines, yet are fair and meet the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2).

More explicitly those sentencing goals include:

[T]he need for the sentence imposed:
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]
*See,* 18 U.S.C. § 3553(a)(2)

Therefore, the Court may not simply presume that the Guidelines range is reasonable. *Gall*, at 50. Rather, the Court must make an individualized assessment based on the facts presented. From its unique vantage, the Court may conclude that, despite the guidelines, "in a particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing. . ." *Kimbrough*, 552 U.S. at 101, *citing* 18 U.S.C. § 3553(a). The not "greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law" and "provide just punishment for the offense." 18 U.S.C. § 3553(a). Indeed, as the Supreme Court suggested in *Gall*, a sentence of imprisonment may not promote respect for the law if it appears unduly harsh in light of the real conduct and circumstances of the particular case. *Gall*, at 54; *see also Rita v. United States*, 551 U.S. 338, 351 (2007) (observing that district court may consider arguments that "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

There is no dispute between the PSR and the plea agreement concerning the applicable guidelines range; both calculate Mr. Thomas' guidelines range to be 210 to 262 months to be followed by a consecutive sentence of 120 months. PSR ¶¶31(c), PSR at pg. 50. Probation recommends a sentence of 228 months imprisonment; more exactly, probation recommends 108 months for Count 8 and 60 months respectively for Counts 9 and 13 with all counts to run consecutively. PSR at pg. 50. We respectfully request a sentence significantly below that recommended by Probation, a sentence which would properly account for all of the § 3553(a) factors.

### *(1) Nature and Circumstances of the Offense – Acceptance of Reasonability*

As described in the Presentence Report ("PSR"), Mr. Thomas was a member of the Wash Gang, which is a gang located in the Bronx that has engaged in all manner of illegal racketeering activity. PSR ¶¶35-41. Relevant here, Mr. Thomas participated in an armed robbery of a pawn shop on June 27, 2020, in Queens, NY, with other co-defendants, wherein co-defendant Jacob Baker was the sole person armed with a firearm. PSR ¶¶49-51 (Count 13). Then again on August 31, 2021, in the Bronx Mr. Thomas was driving a car in a "drive-by shooting" and co-

defendant Jacob Baker who was in the front passenger of that car and holding a firearm discharged multiple rounds striking two women. PSR ¶¶63-64 (Count 9).

Those crimes are extraordinarily serious and the shooting of the two women in August of 2021 is particularly disturbing as they were simply innocent bystanders who were outside enjoying a warm summer night.  Mr. Thomas' specific role in the Queens robbery and the Bronx shooting is significant in that another defendant (Baker) is solely alleged to have *actually* used or possessed the firearm, rather his role should properly reflect a significantly below guidelines sentence.  His relative culpability *vis-à-vis* other co-defendants illustrates the extremis of a just punishment contemplated by the guidelines range and Probation's exacting recommendation.

Mr. Thomas is acutely aware that his Wash Gang membership placed innocent people at great risk and the tragic facts of this case graphically illustrates that peril.  He has expressed profound remorse for his conduct and readily admits that gang-membership is "*not* a victim-less crime."  Put simply, Mr. Thomas did not calculate the risks inherent in his membership in a violent street gang like the Wash Gang.  Isaiah in no-way seeks to minimize his offense conduct. He categorically accepts his guilt and more meaningfully he accepts his shameful role as a member of a violent street gang.

Mr. Thomas was arrested for the instant offense on January 12, 2023, while he was serving a state prison sentence in Maine.  PSR at pg. 3, PSR ¶132. That Mr. Thomas was the first defendant in this indictment to plead guilty is illustrative of his prompt and immediate acceptance of responsibility, his desire for accountability and his unequivocal recognition of his guilt.

### *(2) History and Characteristics*

As detailed above Mr. Thomas' neglected childhood and deeply troubled family life is an obvious factor that should be considered in determining an appropriate sentence.  Courts will often consider how adverse socio-economic conditions affect defendants and their relationship to the criminal justice system. *See U.S. v. Bannister*, 786 F. Supp. 617 (E.D.N.Y.  2011).  The late great Hon. Jack B. Weinstein eloquently writes in his *Bannister* decision:

> Had the defendants been raised by cohesive, adequate families, most of the difficulties they encountered would probably never have come to pass. Well-resourced, attentive parents would have had the knowledge, ability, and insight to protect their children from many of the difficulties that befell these defendants in their youth, to obtain assistance to deal with their psychological and physical problems, to obtain crucial opportunities for education, work, and personal growth, and to act as useful role models. Those with learning disabilities would likely have been provided available resources to overcome their impairments at public expense. That the defendants were born into circumstances without such support is at the center of this tragedy.
> *Id.*  at 688-689.

By any measure, Mr. Thomas grew up in a chaotic and neglected environment dominated by absent parents and marked by domestic violence. His struggles with crushing depression and anxiety most assuredly contributed to his adulthood irresponsibility and his habitual substance abuse; all of those factors inform a whole host of terrible decisions made by Mr. Thomas throughout his adulthood.

### Youthful Individuals

Much of Mr. Thomas's criminal history and the instant offense conduct occurred when he was very young man; aged 19 through age 22. Significantly, on April 30, 2024, the United States Sentencing Commission has adopted new rules which amends the policy statement related to "Age" at U.S.S.G. §5H1.1 to provide stronger language permitting a downward departure or alternative to incarceration to account for "youthfulness" in appropriate cases. *See,* U.S.S.G. Adopted Amendments, *available at* https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2024 (At Pg. 25 of 70).[3]

The adopted amendment to U.S.S.G.§5H1.1 Age (policy statement) provides:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.
>
> The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.
> *Id.*

In support of this amendment the U.S.S.G. commission cited extensive research on the impulsive behavior and poor risk-assessment of young developing brains well into their 20s. *See, e.g.*, U.S. SENT'G COMM'N, YOUTHFUL OFFENDERS IN THE FEDERAL SYSTEM 6–7 (2017); Daniel Romer et al., *Beyond Stereotypes of Adolescent Risk Taking: Placing the Adolescent Brain in Developmental Context,* 27 DEVELOPMENTAL COGNITIVE NEUROSCIENCE 19 (2017); Laurence Steinberg & Grace Icenogle, *Using Developmental*

---

[3] This Adopted Amendment to the U.S.S.G. takes effect on November 1, 2024.

*Science to Distinguish Adolescents and Adults Under the Law*, 1 ANN. REV. DEVELOPMENTAL PSYCH. 21 (2019).[4]

Notably, the downward departure confirms the relevancy of youthfulness at the time of the offense or prior offenses. And "youthfulness" extends to people in their mid-20s. Indeed, Mr. Thomas' extensive criminal record for shoplifting and the instant offense conduct seem to exactly embody the poor impulse control of a young developing brain. So we ask the Court to appropriately weigh Mr. Thomas' background and characteristics along with all the factors in 18 U.S.C. § 3553(a) in affording him a downward variance.

### Criminal History Category is Overstated

To be sure, Mr. Thomas has a lot of criminal convictions and Mr. Thomas does not dispute his Criminal History Category of VI; but we contend that this classification vastly overstates his *true* criminal history. All of his prior convictions involve thefts from department stores or possession of small amounts of narcotics. None of his prior convictions are "violent crimes" and none involve the use of any firearms.

We respectfully request that either a downward departure, under U.S.S.G. § 4A1.3(b), or variance be applied pursuant to 18 U.S.C. § 3553(a) because Mr. Thomas' criminal history is overstated. See e.g., *United States v. Ramirez,* 421 F.3d 159, 166 (2d Cir. 2005) ("The Current section 4A1.3(b)(1) provides for the possibility 'that a defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes,' and authorizes the sentencing court to consider a downward departure to rectify any injustice created by faithful application of the Guidelines.") (internal citations omitted); *United States v. Hilts*, 696 F. App'x 1, 3 n.2 (2d Cir. 2017) ("Under U.S.S.G. § 4A1.3(b), a downward departure 'may' be warranted if 'the defendant's criminal history category substantially over-represents the seriousness of [his] criminal history or the likelihood that [he] will commit other crimes.'") (citing *United States v. Ingram*, 721 F.3d 35, 38-39 (2d Cir. 2013); *United States v. Montanez*, 717 F.3d 287, 289 (2d Cir. 2013) (same).

### *(3) Significantly Below Guidelines Sentence is Sufficient, But Not Greater than Necessary, to Satisfy the Purposes of Sentencing*

By any measure Mr. Thomas' offense conduct is deeply troubling and worthy of an appropriately significant jail sentence. He is facing a mandatory minimum of 10 years in jail and Mr. Thomas is well aware that any jail sentence means that much of his adulthood will be spent in a BOP jail. However, the 19 year jail sentence recommended by Probation is in a word, cruel. Such a lengthy sentence would mean Mr. Thomas will remain in jail well into his 40s and not see his baby daughter again until she is a grown woman; which based on his role in this conspiracy is particularly excessive. The draconian sentence contemplated by the guidelines and recommended by Probation frustrates the goals articulated in § 3553(a).

Mr. Thomas has been incarcerated at MDC jail for the past 17 months and immediately

---

[4] *See*, https://www.ussc.gov/guidelines/amendments/proposed-2024-amendments-federal-sentencing-guidelines (At Pg. 15 of 621).

8

prior to that it appears he had been in jail for well over a year serving various jail sentences in New York City and in Maine.  PSR ¶¶132-133. In total Mr. Thomas will have been in jail for over two and half years – in Federal and State custody - by the time he is ultimately sentenced on this case.  That time coupled with the sentence he receives from the Court will mean most of his 20s and conceivably much of his 30s will be spent behind bars; to be sure that fate is entirely his responsibility for engaging in criminal conduct.

A sentence below the guidelines range will still mandate at least a 10 year jail sentence, a significant jail sentence that would assuredly discourage his recidivism, to that end Mr. Thomas has confided that the last year at MDC has been deeply impactful upon him and he is unyielding in his desire to turn his life around and never return to jail.  Reflection, during Mr. Thomas' present period of incarceration has brought some measure of insight into his selfish behavior and measured confidence that he is a changed man.

Indeed, the U.S.S.G. drafters have recently recognized the abundant research on the rates of recidivism and its direct correlation to age, and a 10 year sentence would mean Mr. Thomas' release when he is in his mid-30s when the rates of re-arrest start to dramatically decline. *See*, Ryan Cotter, Courtney Semisch & David Rutter, *U.S. Sent'g Comm'n, Recidivism of Federal Offenders Released in 2010* (2021); *see also* Kim Steven Hunt & Billy Easley II, *U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders* (2017).[5]

Consequently, a  sentence of 10 years would be sufficient but not greater than necessary to satisfy the § 3553(a) goals.   A sentence of 10 years appropriately reflects the seriousness of Mr. Thomas' offense conduct, affords respect for the law and adequate deterrence, and is resolutely a just punishment.

### *(4) Provide Medical and Mental Health Treatment*

Mr. Thomas' mental health, suicidal ideation and drug abuse are another basis for a significantly below guidelines sentence.  Sentencing courts are mandated to consider the need to provide medical care for defendants and his substance abuse and long struggle with depression certainly qualify. *See* 18 U.S.C. § 3553(a)(2)(D).  Indeed, our nation's prisons have become the largest "provider" of mental health in-patient treatment with upwards of 300,000 fellow Americans in jail with "major psychological problems."  *See,* Glenn Thrush, *When Prison and Mental Illness Amount to a Death Sentence,* N. Y. Times (May 5, 2024), *available at* https://www.nytimes.com/2024/05/05/us/politics/prison-mental-health-care.html.  Tragically, the only consistent "treatment" Mr. Thomas has received to address his mental illness has been time held in various jails.

As discussed in his PSR report Mr. Thomas has abused marijuana, synthetic marijuana and opiates for many years.  He would greatly benefit from mental health treatment and substance abuse counseling during his incarceration.  Mr. Thomas acknowledges that his substance abuse has contributed to his poor decision making and he readily accepts that alcohol, marijuana, and opiates were awful ways to "treat" his depression. To that end we respectfully request the Court

---

[5] *See*, https://www.ussc.gov/guidelines/amendments/proposed-2024-amendments-federal-sentencing-guidelines (At Pg. 15 of 621).

consider his need and desire to receive treatment for his drug abuse and his underlying struggle with depression.

### *(5) Conditions of Confinement at MDC*

Mr. Thomas has been incarcerated at the MDC jail since January 12, 2023, enduring unusually harsh conditions of confinement during the post-COVID-19 pandemic. Mr. Thomas has confirmed the wretched and brutal conditions of confinement while at the MDC jail, often going many days confined to his jail cell unable to shower or attend to basic needs. Particularly harsh was the near total isolation suffering through long periods of "lockdowns" with little to no communications with his family. Compounding, the brutality of the confinement for Mr. Thomas is the crippling depression that haunts him every day, which has largely gone untreated by the medical staff at MDC. Indeed, it is apparent that MDC is wholly incapable of attending to Mr. Thomas pressing medical needs.

There is no need to reiterate the countless troubling accounts that have inundated the Courts regarding the incompetence of MDC staff and the cruel conditions of confinement. Just a few days ago, Hon. LaShann DeArcy Hall in the Eastern District of New York declared, "At a certain point the MDC is going to have to understand that the judges of this court are no longer going to tolerate the mismanagement of the medical care of the defendants that are in their charge." *See,* John Annese, *Judge Demands Answers from Brooklyn Federal Jail Officials Over Inmate's Medical Woes,* N.Y. Daily News (May 6, 2024), *available at https://www.nydailynews.com/2024/05/06/judge-demands-answers-from-brooklyn-federal-jail-officials-over-inmates-medical-woes/*

Indeed this Court has squarely and forthrightly addressed this very issue, "[f]or years, the conditions in the federal jails that serve this District… have been a major, growing and widely understood problem." *See*, Opinion and Order at 1, *United States v. Chavez,* No. 22-CR-303 (JMF) (S.D.N.Y. Jan. 4, 2024), ECF No. 32. This Court wrote "[t]he conditions at the MDC are dreadful in many respects" highlighting three areas of concern, including (Id. at 9):

> First, "the inordinate amount of time in 'lockdown,'" (Id. at 9);
> Second, "the MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment" (Id. at 10); and
> Third, "the MDC's physical conditions have long been problematic" (Id. at 12).

This Court continued that the "grim conditions" at MDC are systemic and the prospects for improvement are highly doubtful. Id. at 18.

Of particular relevance for Mr. Thomas has been the inability of MDC staff to help treat his crippling mental health condition, most graphically demonstrated by his suicide attempt on May 31, 2023 (which mercifully was ultimately interrupted by MDC staff). Time spent under such intense emotional strain simply cannot be equated with the anticipated punishment represented in the sentencing guidelines. It would be unjust to discount this reality. Reduced to its essence, we respectfully submit that each month served in the MDC jail during this time is "worth more" when considering the requirement of just punishment than a month spent under more "normal" circumstances. *See e.g. U.S. v. Carty,* 264 F.3d 191, 196 (2d Cir. 2001)

(presentence confinement conditions may in appropriate cases be a permissible basis for a lesser sentence).

### IV.     Conclusion

We respectfully request the Court sentence Mr. Thomas to the mandatory minimum sentence of 120 months of imprisonment; needless to say we are cognizant that this request is a significant variance from the guideline range. However, it accurately reflects the unique circumstances of this case and the individual that is Mr. Thomas.  In sum, the significantly below guideline sentence as requested by the defense would properly account for Mr. Thomas' role in the offense conduct, his prompt acceptance of responsibility, his medical condition, the conditions of his confinement and his compelling personal history.

    Sincerely,
    /s/
    Christopher Wright